IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 33280-2-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | OPINION PUBLISHED IN PART |
| | ) | |
| ERIC ALLEN HAGGIN, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Eric Haggin appeals his convictions for two counts of

first degree unlawful possession of a firearm, possession of methamphetamine with intent

to deliver, possession of heroin with intent to deliver, use of drug paraphernalia, second

degree theft, and witness tampering. He raises six arguments on appeal.

In the published portion of this opinion, we address Mr. Haggin's fourth argument:

the trial court erred when it ran his two unlawful possession of firearm sentences

consecutively. We hold that the second sentence of RCW 9.94A.589(1)(c) must be read

in tandem with the first sentence, so that multiple current convictions for unlawful

possession of firearm offenses result in concurrent sentences, unless there also is a current

conviction for theft of a firearm and/or possession of a stolen firearm. In the unpublished

portion of this opinion, we address and generally reject Mr. Haggin's remaining arguments. We therefore affirm in part and remand for resentencing in accordance with this opinion.

## FACTS

In August 2014, Christy Stransky and her boyfriend, Cordra Gill, traveled to Ellensburg, Washington, so Mr. Gill could compete as a professional roper in the Ellensburg Rodeo. During their stay, they went to a laundromat to wash their clothes. Ms. Stransky put their clothes in the dryer and the two left. When they returned, their clothes were not there. Ms. Stransky contacted the laundromat's owner and they watched the laundromat's surveillance video. On the video, Ms. Stransky saw a man come in, open the dryer that her and Mr. Gill's clothes were in, and take them. Ms. Stransky eventually called the police.

The laundromat's owner showed Officer Josh Ingraham the video and Officer Ingraham recognized Mr. Haggin as the man who took the clothes. Officer Ingraham obtained a warrant to search Mr. Haggin's apartment for the clothing. The police went to the apartment where Mr. Haggin and his girlfriend, Asenet Diaz, both lived. The police searched the apartment and found the missing clothing. While searching the apartment,

2

Officer Ingraham saw a tray of suspected heroin, methamphetamine, and drug paraphernalia.

Officer Ingraham showed the tray to Detective Klifford Caillier, who then left and applied for a warrant to search for controlled substances. Officer Ingraham then found a pistol in a backpack and a revolver inside a box on a dresser. There were two dressers in the room, and the dresser with the revolver on top of it had female clothing in it, as well as makeup and feminine products on it. Detective Caillier believed this dresser was Ms. Diaz's.

The officers executed the second warrant and found a plastic bag and a tin in the freezer that contained suspected heroin. Detective Caillier also searched the backpack, which contained baggies of suspected heroin and large quantities of suspected methamphetamine in rock form. Detective Caillier also found digital scales and ledgers.

The State charged Mr. Haggin and Ms. Diaz with possession of a stolen firearm, possession of methamphetamine with intent to deliver, possession of heroin with intent to deliver, and two counts of use of drug paraphernalia. The State also charged Mr. Haggin individually with two counts of first degree unlawful possession of a firearm and second degree theft. Ms. Diaz pleaded guilty to solicitation to possess a controlled substance with intent to deliver and possession of a stolen firearm.

The jury convicted Mr. Haggin of both counts of first degree unlawful possession of a firearm, both counts of possession of a controlled substance with intent to deliver, both counts of use of drug paraphernalia, second degree theft, and tampering with a witness. The jury also returned a special verdict finding that Mr. Haggin was armed with a firearm at the time he committed both counts of possession with intent to deliver. The jury acquitted Mr. Haggin of possession of a stolen firearm.

The trial court sentenced Mr. Haggin to 101 months' incarceration on both unlawful possession of a firearm counts and ordered both sentences to run consecutively. The trial court ran the remaining sentences concurrently. The trial court sentenced Mr. Haggin to 36 months' confinement on each firearm enhancement, and ran each enhancement consecutively to the end of the sentence. The trial court also imposed 12 months' community custody to follow Mr. Haggin's terms of confinement for his possession with intent to deliver convictions. Mr. Haggin appeals.

## ANALYSIS

A.   CONSECUTIVE SENTENCES FOR UNLAWFUL POSSESSION OF FIREARM
     CONVICTIONS AND RCW 9.94A.589(1)(c)

Mr. Haggin argues the trial court erred when it ran his two sentences for unlawful possession of a firearm consecutively. The parties dispute the meaning of RCW 9.94A.589(1)(c), which provides:

4

If an offender is convicted under RCW 9.41.040 for unlawful possession of a firearm in the first or second degree and for the felony crimes of theft of a firearm or possession of a stolen firearm, or both, the standard sentence range for each of these current offenses shall be determined by using all other current and prior convictions, except other current convictions for the felony crimes listed in this subsection (1)(c), as if they were prior convictions. The offender shall serve consecutive sentences for each conviction of the felony crimes listed in this subsection (1)(c), and for each firearm unlawfully possessed.

The fundamental goal of statutory interpretation is to discern and implement the legislature's intent. *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003). When interpreting a statute, courts look first to the statute's plain meaning. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). "Plain meaning is discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." *Christensen v. Ellsworth*, 162 Wn.2d 365, 373, 173 P.3d 228 (2007). "If the statutory language is susceptible to more than one reasonable interpretation, then a court may resort to statutory construction, legislative history, and relevant case law for assistance in discerning legislative intent." *Id.*

This court construes the meaning of a statute by reading it in its entirety and considering its relation with other statutes. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 11, 43 P.3d 4 (2002). Statutes relating to the same subject matter must be

5

construed together. *Hallauer v. Spectrum Prop., Inc.*, 143 Wn.2d 126, 146, 18 P.3d 540 (2001) (quoting *In re Pers. Restraint of Yim*, 139 Wn.2d 581, 592, 989 P.2d 512 (1999)). Statutes relating to the same subject matter "'are to be read together as constituting a unified whole, to the end that a harmonious, total statutory scheme evolves which maintains the integrity of the respective statutes.'" *Id.* (quoting *State v. Wright*, 84 Wn.2d 645, 650, 529 P.2d 453 (1974)). Statutory interpretation is a question of law this court reviews de novo. *State v. Gonzalez*, 168 Wn.2d 256, 263, 226 P.3d 131 (2010).

The issue here is whether RCW 9.94A.589(1)(c) requires consecutive sentences when a defendant is convicted of multiple counts of unlawful possession of a firearm, but is *not* convicted of either firearm theft or possession of a stolen firearm. The crux of the issue is whether RCW 9.94A.589(1)(c)'s second sentence functions independently of the first sentence, as if it were its own separate statute, or whether the second sentence only functions in tandem with the first sentence. Because it is not clear how the second sentence functions with respect to the first, there is an ambiguity that requires this court to apply rules of statutory construction.

The State argues the sentences function independently. This would mean that trial courts must run all sentences for unlawful possession, firearm theft, and possession of a stolen firearm consecutively, in addition to consecutive sentences for every firearm. In

6

contrast, Mr. Haggin argues the second sentence only applies when a person is convicted

of unlawful possession *and either* theft of a firearm *or* possessing a stolen firearm.

Because the jury acquitted him of possessing a stolen firearm, he contends that RCW

9.94A.589(1)(c) does not apply and RCW 9.94A.589(1)(a) controls, which requires

concurrent sentences.

        1.     *Canons of statutory construction*

Several canons of statutory construction support Mr. Haggin's interpretation.

First, the principle that a statute should be construed by reading it *in its entirety* supports

interpreting RCW 9.94A.589(1)(c) so the second sentence modifies the first sentence.

The principle that construing statutes together when they relate to the same subject

matter also supports this interpretation. A similar provision, RCW 9.41.040(6), provides

in relevant part:

> Notwithstanding any other law, if the offender is convicted under this
> section for unlawful possession of a firearm in the first or second degree
> and for the felony crimes of theft of a firearm or possession of a stolen
> firearm, or both, then the offender shall serve consecutive sentences for
> each of the felony crimes of conviction listed in this subsection.

This provision states the rule more clearly: a trial court can only impose consecutive

sentences when the defendant is convicted of unlawful possession *and either* theft of a

firearm *or* possession of a stolen firearm. Thus, under RCW 9.41.040(6), if a person is

7

convicted of multiple counts but only in one category (i.e., multiple counts of unlawful possession), the trial court must run those sentences concurrently. Interpreting RCW 9.94A.589(1)(c) consistently with RCW 9.41.040(6) results in a harmonious, unified statutory scheme.

### 2. *Relevant case law*

Although no published case explicitly addresses this ambiguity, relevant case law supports Mr. Haggin's interpretation. In *Murphy*, the jury convicted Thomas Murphy of five counts of firearm theft and five counts of unlawful possession. *State v. Murphy*, 98 Wn. App. 42, 45, 988 P.2d 1018 (1999). The trial court ran the five theft counts concurrently with one another and the five unlawful possession counts concurrently with one another, but ran the two groups of firearm counts consecutively to one another. *Id.* at 46. The *Murphy* court reversed, finding that under RCW 9.41.040(6) "the trial court should have run each of [Mr.] Murphy's 10 firearm theft and unlawful possession convictions consecutively to one another." *Id.* at 49.

In doing so, the *Murphy* court acknowledged that the legislature had recently amended the Hard Time for Armed Crime Act (HTACA) to include the provision at issue

8

in this case.[1] *Id.* at 48 n.7. The court noted that it "view[ed] this amendment, *not as a change to the effect of the statute as previously worded, but rather as an underscore that the Legislature meant what it said originally* in the plain language of [RCW 9.41.040(6)], as prefaced by 'Notwithstanding any other law.'" *Id.* (emphasis added); *see also State v. Haddock*, 141 Wn.2d 103, 115 n.7, 3 P.3d 733 (2000) ("LAWS OF 1998, ch. 235, § 2 added subsection (1)(c) relating to serving consecutive sentences for crimes involving *both* possession of a firearm *and* theft of a firearm or possession of a stolen firearm.") (emphasis added).

### 3. *Legislative history*

Finally, RCW 9.94A.589(1)(c)'s legislative history supports Mr. Haggin's interpretation. In 1995, the legislature passed the HTACA. LAWS OF 1995, ch. 129. The HTACA originally included RCW 9.41.040(6).[2] *See* LAWS OF 1995, ch. 129, § 16(6). The purpose of this subsection, according to the House Bill Report, was to establish that

> If the person is also serving time for possession of a stolen firearm or stealing a firearm, the time served for unlawful possession of firearms must be served consecutively with the other offenses.

---

[1] At the time, the provision was codified as former RCW 9.94A.400(1)(c). In 2001, the legislature recodified former RCW 9.94A.400 as RCW 9.94A.589, but did not make any substantive changes. *See* LAWS OF 2001, ch. 10, § 6.

[2] The legislature has never amended RCW 9.41.040(6).

H.B. REP. ON INITIATIVE 159, at 6, 54th Leg., Reg. Sess. (Wash. 1995).

In 1998, the legislature enacted former RCW 9.94A.400(1)(c):

If an offender is convicted under RCW 9.41.040 for unlawful possession of a firearm in the first or second degree and for the felony crimes of theft of a firearm or possession of a stolen firearm, or both, then the offender shall serve consecutive sentences for each conviction of the felony crimes listed in this subsection, and for each firearm unlawfully possessed.

LAWS OF 1998, ch. 235, § 2(1)(c). Former RCW 9.94A.400(1)(c) was virtually identical to RCW 9.41.040(6). As noted above, the *Murphy* court interpreted former RCW 9.94A.400(1)(c) and RCW 9.41.040(6) as having the same meaning. *Murphy*, 98 Wn. App. at 48 n.7. The stated purpose of the amendments was to

amend[ ] the Sentencing Reform Act [of 1981, chapter 9.94A RCW] to provide that sentences must be served consecutively for the multiple offenses of unlawful possession of a firearm in the first or second degree and possession of a stolen firearm or theft of a firearm, but that current weapon-related offenses may not be considered in criminal history when calculating the offender score to determine the sentence range.

FINAL H.B. REP. ON H.B. 1544, at 3, 56th Leg., Reg. Sess. (Wash. 1999).

However, after the former RCW 9.94A.400 amendments went into effect, the legislature determined that "[t]he language of the bill had an unintended effect of preventing the consideration of any current offense when calculating the offender score." FINAL H.B. REP. ON H.B. 1544, at 3, 56th Leg., Reg. Sess. (Wash. 1999). Accordingly, the next year the legislature "amend[ed] the statute for persons convicted of multiple

10

firearm offenses to allow consideration of any current and prior convictions except other current weapons related convictions when calculating the offender score." S.B. REP. ON H.B. 1544, at 2, 56th Leg., Reg. Sess. (Wash. 1999).

This 1999 amendment separated former RCW 9.94A.400(1)(c) into two different sentences. *See* LAWS OF 1999, ch. 352, § 11(1)(c). The first sentence clarified that all current and prior convictions must be added to the defendant's offender score *except* current weapons-related convictions. The second sentence—which states that the defendant must serve consecutive sentences on each conviction for the crimes in this subsection and for each firearm unlawfully possessed—remained the same as it did before the amendment.

The legislative history expressly states that the purpose of the amendment that separated RCW 9.94A.589(1)(c) into two sentences was to make sentencing courts calculate other nonweapons-related current offenses into defendants' offender scores. The legislature never intended for the second sentence in RCW 9.94A.589(1)(c) to operate independently from the rest of subsection (1)(c). RCW 9.94A.589(1)(c) only requires trial courts to run sentences consecutively when a person is convicted of unlawful possession *in addition to* firearm theft *or* possession of a stolen firearm.

11

RCW 9.94A.589(1)(c) does not apply here because the jury acquitted Mr. Haggin of possessing a stolen firearm and, therefore, the trial court erred when it ran his two unlawful possession of a firearm sentences consecutively. The trial court should have run the sentences concurrently per RCW 9.94A.589(1)(a).

Remanded for resentencing. In the unpublished portion of this opinion, we affirm Mr. Haggin's convictions.

A majority of the panel has determined that only the forgoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder, having no precedential value, shall be filed for public record pursuant to RCW 2.06.040.

ADDITIONAL FACTS

While awaiting trial in the county jail, Mr. Haggin called an unknown female through the jail's telephone system. Mr. Haggin asked the female to find Ms. Stransky on Facebook and offered to compensate her for dropping the charges. The jail's telephone system recorded Mr. Haggin's telephone conversation and Detective Caillier listened to it the next day. No one other than the police and prosecutor's office ever contacted Ms. Stransky about the case.

The State amended the information to include a witness tampering charge and an additional count of first degree unlawful possession of a firearm. In the amended

12

information, the State alleged that Mr. Haggin or an accomplice was armed with a firearm during the commission of each of the possession with intent to deliver offenses.

Detective Caillier testified at trial. He testified that a person who has drugs for personal use has a small amount—one gram or less of methamphetamine and one-half a gram of heroin. He testified that the methamphetamine he found in the backpack was the size of a racquet ball and he recognized this amount to be larger than an amount for personal use. He later testified that the money he found in Mr. Haggin's wallet was indicative of money from drug sales. Mr. Haggin did not object to any of this testimony.

Ms. Diaz testified the revolver in the box on the dresser was hers, as well as the backpack that contained the pistol and suspected methamphetamine. In closing, Mr. Haggin argued the guns and drugs were Ms. Diaz's, Ms. Diaz was the person dealing the drugs, and he was not aware the guns and drugs were in the house. The State argued both guns belonged to Mr. Haggin.

The trial court instructed the jury regarding the deadly weapon special verdict for the possession with intent to deliver charges. Instruction 38 provided in part, "[i]f one participant to a crime is armed with a deadly weapon, all accomplices to that participant are deemed to be so armed, even if only one deadly weapon is involved." Clerk's Papers (CP) at 139. Mr. Haggin did not object to the instruction.

During deliberations, the jury had the bailiff deliver the following question to the court:

For [the] special verdict, since [Ms.] Diaz plead guilty to possession with intent to distribute and claimed [the] firearms were hers, is [Mr.] Haggin considered an accomplice for purposes of instruction 38 lines 14-15[?]

CP at 142. Mr. Haggin asked the trial court to answer the question "no," arguing that he was not charged under an accomplice theory and that telling the jury to reread the instructions would result in the jury convicting him based on an uncharged element. The State asked the trial court to refer the jury to the instructions, but added that perhaps the term "accomplice" should have been defined. Mr. Haggin did not argue for the court to define "accomplice." The trial court, unsure of what the jury was thinking and not wanting to lead them one direction or another, responded to the question by telling the jury to refer to the instructions.

The judgment and sentence stated that Mr. Haggin's legal financial obligation (LFO) payments would "commenc[e] upon release." CP at 168. The trial court attached an appendix to the judgment and sentence that stated Mr. Haggin's first payment "shall be due 30 days from the date of . . . the Judgment and Sentence was signed in court." CP at 174.

14

ADDITIONAL ANALYSIS

A.    OPINION TESTIMONY

Mr. Haggin argues that the State improperly solicited opinion testimony from Detective Caillier that the quantity of drugs was too great for personal use and that the money in Mr. Haggin's wallet looked like it came from drug sales.[3]  Mr. Haggin argues this testimony invaded the province of the jury.

Under ER 704, "[t]estimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  However, lay and expert witnesses may not testify as to the guilt of the defendants, either directly or by inference. *State v. Olmedo*, 112 Wn. App. 525, 530, 49 P.3d 960 (2002).  The question of whether a witness's testimony constitutes an impermissible opinion on the defendant's guilt is determined from the circumstances of each case. *Id.* at 531.

Generally, improper opinions on guilt involve an assertion pertaining directly to the defendant. *City of Seattle v. Heatley*, 70 Wn. App. 573, 577, 854 P.2d 658 (1993); *State v. Sanders*, 66 Wn. App. 380, 387, 832 P.2d 1326 (1992).  Opinion testimony is not

_____

[3] Officer Ingraham also testified about the quantities of methamphetamine and heroin that personal users typically purchase, and Dr. Edward Suzuki testified about the average quantities of the drugs he analyzes.  Mr. Haggin only challenges Detective

15

improper if it is not a direct comment on the defendant's guilt, is otherwise helpful to the jury, and is based on inferences from the evidence. *Heatley*, 70 Wn. App. at 578. However, an opinion about a defendant's guilt is more likely to be improper when it is given by a police officer or other government official because it carries an "aura of reliability." *State v. Montgomery*, 163 Wn.2d 577, 595, 183 P.3d 267 (2008).

In *Sanders*, the police searched Betty Sanders's apartment and found a plate with two large balls of crack cocaine on it, but did not find any used drug paraphernalia. *Sanders*, 66 Wn. App. at 381-82. The State charged Ms. Sanders with possession with intent to deliver and at trial the prosecutor asked the officer if there was "'any significance in the absence of implements used to smoke crack cocaine.'" *Id.* at 383. The officer responded that "'the lack of items associated with the smoking of crack cocaine indicates that that house is not used for that purpose and the persons within do not do so frequently at all.'" *Id.* at 384.

The *Sanders* court held the officer's testimony was not an improper opinion on Ms. Sanders's guilt, reasoning that it was an inference based solely on the physical evidence and the officer's experience, the officer did not express any direct opinion as to

Caillier's testimony.

16

Ms. Sanders's guilt or credibility, and the testimony left the question of whether Ms. Sanders unwittingly possessed the cocaine to the jury. *Id.* at 388-89.

Mr. Haggin relies on *Montgomery*. In *Montgomery*, the detectives followed the defendants from store to store where the defendants purchased various ingredients that could be used to manufacture methamphetamine. *Montgomery*, 163 Wn.2d at 585. The State charged Mr. Montgomery with possessing pseudoephedrine with intent to manufacture. *Id.* at 586. At trial the detective testified:

"I felt very strongly that they were, in fact, buying ingredients to manufacture methamphetamine based on what they had purchased, the manner in which they had done it, going from different stores, going to different checkout lanes. I'd seen those actions several times before."

*Id.* at 587-88. Another detective testified that "'those items were purchased for manufacturing.'" *Id.* 588. Later, the State's forensic chemist looked at the combined purchases and testified that "'these are all what lead me toward this pseudoephedrine is possessed with intent.'" *Id.*

The *Montgomery* court held that all of this testimony was an improper opinion on Mr. Montgomery's guilt. *Id.* at 595. The court stated that the opinions went to the core issue of Mr. Montgomery's intent, used explicit expressions of personal belief, once even parroted the legal standard, and although the opinions contained an "aura of reliability," police officers' opinions on guilt actually have low probative value. *Id.* at 594-95.

17

At trial, Mr. Haggin did not object to any of Detective Caillier's opinion testimony. This court generally declines to address issues not raised below. *See* RAP 2.5(a). One exception to this general rule is a manifest constitutional error. *See* RAP 2.5(a)(3). "Permitting a witness to testify as to the defendant's guilt raises a constitutional issue because it invades the province of the jury and the defendant's constitutional right to a trial by jury." *Olmedo*, 112 Wn. App. at 533; *accord State v. Kirkman*, 159 Wn.2d 918, 927, 155 P.3d 125 (2007).

However, RAP 2.5(a)(3) also requires an appellant to show the error was "manifest," which requires a plausible showing "'that the asserted error had practical and identifiable consequences in the trial of the case.'" *Kirkman*, 159 Wn.2d at 935 (internal quotation marks omitted) (quoting *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)). For a witness's opinion testimony to constitute "manifest error," the witness's testimony must include an "explicit or almost explicit" opinion on the defendant's guilt. *Kirkman*, 159 Wn.2d at 937. We apply this standard to our analysis.

1.    *Testimony about personal use amounts*

Mr. Haggin first argues the following was improper opinion testimony:

> [State:] Do you know—have you had a chance to investigate personal use cases where people just have drugs for their own personal use?
> [Detective Caillier:] Yes, numerous times. On patrol mainly is where I dealt with that.

18

> [State:] And when you're dealing with somebody who has drugs for personal use, is there typically a quantity you're used to seeing?
>
> [Detective Caillier:] Yes. It's a very small, small amount.
>
> [State:] And when you say small amount, what does that mean to you?
>
> [Detective Caillier:] I normally what I would see is a gram or less of methamphetamine and heroin was usually less than a gram, half a gram.
>
> [State:] Okay. So when you see cases where there's a 100 or more grams of methamphetamine what does that indicate to you, if anything?
>
> [Detective Caillier:] That that's no longer being used for personal use.
>
> . . . .
>
> [State:] Okay. What about heroin, what's typical to see somebody have for personal use, if you know?
>
> [Detective Caillier:] The best way I can describe heroin personal use is if you took a raisin and you cut it in half . . . usually what we see on a personal level is about your fingertip, the size of a raisin, usually looks kind of like [a] raisin squished down. That's about what you're getting. . . . I mean, you're looking at about a gram, half a gram.

Report of Proceedings (RP) at 89-90.

This testimony was not an explicit or almost explicit opinion on Mr. Haggin's guilt. Although Detective Caillier's testimony carried an "aura of reliability," he only described what quantities of methamphetamine and heroin are *generally* consistent with personal use. This was general background information based on Detective Caillier's experience, was helpful to the jury, and was not an assertion that pertained directly to Mr. Haggin. *See Heatley*, 70 Wn. App. at 577-78.

19

2. *Testimony about methamphetamine in backpack*

Later, the State questioned Detective Caillier about his search of the backpack.

Mr. Haggin argues the following was an improper opinion on his guilt:

> [State:] Okay. And then No. 40, what's that show?
>
> [Detective Caillier:] Those are the bags that were located inside that previous photo that you just looked at.
>
> [State:] Okay, and did you have an idea of what was contained in these bags when you took them out?
>
> [Detective Caillier:] Yes. Based on my training and experience, I recognized it to be methamphetamine on a larger scale other than just personal—what I recognize as personal use.
>
> [State:] Okay, and you say a larger scale. What do you mean? What are you talking about for those of us that don't [use] methamphetamine.
>
> [Detective Caillier:] Typically a user amount like Officer Ingraham also described. I mean, we're looking at about one gram of methamphetamine and in its state used on the personal level, it's a little tiny sometimes specks almost. . . . This—in this—in its form were large shards and then even as to say, the size of [a] racquet ball, the one piece. I mean, the best I can describe is the size of [a] racquet ball so you're looking about that big. When you go from a gram of methamphetamine that can take a little one inch by one inch approximately bag that we see normally used for personal use and you barely, you know, line the bottom of it. That's what we're looking at. I mean, that's what personal use is and that's all broken down material. This is not one gram of methamphetamine.
>
> [State:] This is—is it safe to say this is a lot of methamphetamine?
>
> [Detective Caillier:] Yes.
>
> [State:] Have you ever personally seen this much methamphetamine?
>
> [Detective Caillier:] No. I've only seen user amounts—
>
> [State:] Okay.
>
> [Detective Caillier:] —several grams.

RP at 128.

This also was not an explicit or almost explicit opinion on Mr. Haggin's guilt.

Detective Caillier described the methamphetamine he found in the backpack as being

greater than a typical amount for personal use, but this testimony did not pertain directly

to Mr. Haggin. Like the testimony at issue in *Sanders*, Detective Caillier made an

inference based on the physical evidence and his experience.

3. *Testimony about money in wallet*

The State questioned Detective Caillier about various other items that were in the

apartment. One of these items was a wallet, which Detective Caillier identified as Mr.

Haggin's. Mr. Haggin argues the following was improper opinion testimony:

> [State:] And what was in the wallet?
> [Detective Caillier:] I believe it was over $800.00 in cash. . . .
>
> . . . .
> . . . I believe I broke it down into hundred dollar stacks, and most of
> it consisted of 20 dollar bills which based on my training and experience is
> indicative of money from drug sales.

RP at 136.

Unlike the prior challenged testimony, this testimony directly involved Mr.

Haggin. However, unlike the officers' testimony in *Montgomery*, Detective Caillier did

not testify directly about Mr. Haggin's guilt or intent, did not use explicit expressions of

his personal belief, nor did he parrot the legal standard. Although it is a closer call than

the prior testimony, *Kirkman* requires a witness to state an "explicit or almost explicit"

21

opinion on the defendant's *guilt* for unobjected to testimony to constitute manifest error. Detective Caillier's testimony about the money in Mr. Haggin's wallet does not meet that high standard.

We conclude that Detective Caillier's various opinions were not improper and certainly were not so improper to constitute manifest constitutional error.

B.     SUFFICIENCY OF EVIDENCE FOR WITNESS TAMPERING

Mr. Haggin argues that the State's evidence was insufficient to support his conviction for witness tampering because he never asked Ms. Stransky to withhold testimony, recant, or not show up for court.  He argues he never actually contacted Ms. Stransky, and only instructed the female on the telephone to offer to pay for Ms. Stransky's lost clothing to see if she would drop the charges.

In a criminal case, the State must provide sufficient evidence to prove each element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  When a defendant challenges the sufficiency of the evidence, the proper inquiry is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068

22

(1992). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.*

This court's role is not to reweigh the evidence and substitute its judgment for that of the jury. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). Instead, because the jurors observed the witnesses testify firsthand, this court defers to the jury's resolution of conflicting testimony, evaluation of witness credibility, and decision regarding the persuasiveness and the appropriate weight to be given the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

RCW 9A.72.120 defines the crime of witness tampering:

(1) A person is guilty of tampering with a witness if he or she attempts to induce a witness or person he or she has reason to believe is about to be called as a witness in any official proceeding or a person whom he or she has reason to believe may have information relevant to a criminal investigation . . . to:
(a) Testify falsely or, without right or privilege to do so, to withhold any testimony; or
(b) Absent himself or herself from such proceedings; or
(c) Withhold from a law enforcement agency information which he or she has relevant to a criminal investigation . . . .

In arguing that the evidence was insufficient to support his convictions, Mr. Haggin cites *State v. Rempel*, 114 Wn.2d 77, 785 P.2d 1134 (1990). In *Rempel*, the State charged Dale Rempel with attempted rape. *Id.* at 81. Mr. Rempel called the victim from

23

jail and apologized, stated "'it'" was going to ruin his life, and asked the victim to "'drop the charges.'" *Id.* at 83.

The court first looked at Mr. Rempel's literal words, noting they did not contain a request to withhold testimony, an express threat, or a promise of any reward, but rather reflected a lay person's perception that the complaining witness can cause a prosecution to be discontinued. *Id.*

Although Mr. Rempel's literal words did not contain an attempt to induce the victim to withhold testimony, the court reasoned the State "is entitled to rely on the inferential meaning of the words and the context in which they were used." *Id.* at 83-84. While the court found that the words "drop the charges" could sustain a conviction in the right factual context, the context of Mr. Rempel's conversation did not lead to a reasonable inference that he actually attempted to induce the victim to withhold testimony. *Id.* at 84.

Here, the State offered the recording of the jail call between Mr. Haggin and the unknown female to support its witness tampering charge:

> "*MR. HAGGIN: Stransky.*
> *FEMALE: Stransky.*
> *MR. HAGGIN: That is the person, if you can find her on Facebook.*
> *That is the person that I accidentally took her clothes—*
> *FEMALE: I'm going to find her FB. It's the girl that supposedly*
> *(inaudible).*

> *MR. HAGGIN: Not supposedly, I accidentally took this female's clothes and it was an accident.*
> *FEMALE: Okay.*
> *MR. HAGGIN: Get a hold of her if you can and ask her what she wants for . . . the inconvenience.*
> *FEMALE: I'm supposed to ask her what she wants for compensation for the inconvenience.*
> *MR. HAGGIN: Feel me?*
> *FEMALE: Yes, I gotcha.*
> *MR. HAGGIN: That's my second degree theft. See what—if she'll drop charges or if—she don't have to drop charges but if she'd be interested in being compensated whatever she wants—*
> *FEMALE: I got it, I got it.*
> *MR. HAGGIN: —to drop charges.*
> *FEMALE: Yeah, I'm looking her up right now."*

RP at 165-66.

*Rempel* is distinguishable. Unlike in *Rempel*, where Mr. Rempel asked the victim to drop the charges but did not promise any reward, Mr. Haggin instructed the female to see if Ms. Stransky would "'*be interested in being compensated whatever she wants . . . to drop charges.*'" RP at 166. A rational jury could have interpreted Mr. Haggin's statement as an attempt to bribe Ms. Stransky to withhold her testimony.

Mr. Haggin argues that the evidence is insufficient because he never actually contacted Ms. Stransky. However, witness tampering does not require actual contact with the witness but only an *attempt* to alter the witness's testimony. *State v. Williamson*, 131 Wn. App. 1, 6, 86 P.3d 1221 (2004) (sufficient evidence supported witness tampering

25

conviction where defendant asked a third party to tell the victim to recant her allegations of sexual abuse), *review granted*, 154 Wn.2d 1031, 119 P.3d 852 (2005).

Mr. Haggin also argues he was simply offering to pay Ms. Stransky for the lost clothing. This argument asks this court to reweigh evidence and substitute its interpretation of the conversation for the jury's. That is not this court's role. Mr. Haggin's innocent explanation that he was offering to pay for the lost clothing was an appropriate jury argument, but the jury did not believe him. *See State v. Brockob*, 159 Wn.2d 311, 337, 150 P.3d 59 (2006) (when evidence supports both innocent and criminal explanation, jury is entitled to infer guilt). This court reviews the evidence in the light most favorable to the jury's verdict. We conclude sufficient evidence supports Mr. Haggin's witness tampering conviction.

C.    JURY INSTRUCTION FOR DEADLY WEAPON ENHANCEMENT

Mr. Haggin argues the jury instruction for the deadly weapon enhancement relieved the State of its burden of proof because it allowed the jury to find that he was armed based on Ms. Diaz's conduct, but failed to instruct the jury on the definition of accomplice liability.

This court reviews alleged errors of law in jury instructions de novo. *State v. Willis*, 153 Wn.2d 366, 370, 103 P.3d 1213 (2005). "Jury instructions are proper when

26

they permit the parties to argue their theories of the case, do not mislead the jury, and properly inform the jury of the applicable law." *Id.*

RCW 9.94A.825 authorizes the jury to return a special verdict when there is "evidence establishing that the accused or an accomplice was armed with a deadly weapon at the time of the commission of the crime." An affirmative finding on the special verdict results in an increase of the defendant's sentence. *See* RCW 9.94A.533(3). WPIC 2.07.02 is the standard instruction for deadly weapon special verdicts when the only weapon the defendant allegedly used is a firearm. *See* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL (WPIC) 2.07.02, at 48 (3d ed. 2008).

In this case, the trial court gave instruction 38, which is virtually identical to WPIC 2.07.02:

> For purposes of a special verdict the State must prove beyond a reasonable doubt that the defendant was armed with a deadly weapon at the time of the commission of the crime in Counts three and four (Possession with Intent to Deliver Controlled Substances).
> A person is armed with a deadly weapon if, at the time of the commission of the crime, the weapon is easily accessible and readily available for offensive or defensive use. The State must prove beyond a reasonable doubt that there was a connection between the weapon and the defendant. The State must also prove beyond a reasonable doubt that there was a connection between the weapon and the crime. In determining whether these connections existed, you should consider, among other factors, the nature of the crime and the circumstances surrounding the

27

commission of the crime, including the location of the weapon at the time of the crime and the type of weapon.

If one participant to a crime is armed with a deadly weapon, all accomplices to that participant are deemed to be so armed, even if only one deadly weapon is involved.

A pistol, revolver, or any other firearm is a deadly weapon whether loaded or unloaded.

CP at 139.

The third paragraph in WPIC 2.07.02 is in brackets. *See* WPIC 2.07.02, at 48 ("[If one participant to a crime is armed with a deadly weapon, all accomplices to that participant are deemed to be so armed . . . .]"). WPIC 2.07.02's "note on use" provides that "[i]f the bracketed material on accomplices is used, use WPIC 10.51, Accomplice—Definition, with this instruction."[4] *Id.* at 49. The trial court never gave WPIC 10.51.

---

[4] WPIC 10.51 provides:

[A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.]

A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:

(1) solicits, commands, encourages, or requests another person to commit the crime; or

(2) aids or agrees to aid another person in planning or committing the crime.

The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the

28

Here, instruction 38 was a proper statement of the applicable law: RCW

9.94A.825. It allowed both sides to argue their theories of the case: the State argued both

guns belonged to Mr. Haggin, and Mr. Haggin argued they both belonged to Ms. Diaz.

However, the jury was likely confused because both parties presented evidence

connecting the guns to Ms. Diaz (Detective Caillier testified the revolver was on Ms.

Diaz's dresser, and Ms. Diaz testified both guns were hers), and the trial court did not

give WPIC 10.51 despite WPIC 2.07.02's "note on use." The jury's confusion was

evidenced by the question it submitted during deliberations asking if Mr. Haggin was

"considered an accomplice for purposes of instruction 38." CP at 142.

Generally, a defendant cannot challenge a jury instruction on appeal if he or she

did not object to the instruction in the trial court. *State v. Salas*, 127 Wn.2d 173, 181, 897

P.2d 1246 (1995). Mr. Haggin did not object to the jury instruction when the court asked

for objections. Also, Mr. Haggin did not argue later, when discussing the jury's question

to the court, that the term "accomplice" should be defined. He had the opportunity to

---

crime. However, more than mere presence and knowledge of the criminal
activity of another must be shown to establish that a person present is an
accomplice.
      [A person who is an accomplice in the commission of a crime is
guilty of that crime whether present at the scene or not.]
WPIC 10.51, at 217.

29

argue this when the State mentioned that perhaps the instructions should have included a definition for "accomplice."

"The failure to instruct a jury on every element of a charged crime is an error of constitutional magnitude." *State v. Gordon*, 172 Wn.2d 671, 677, 260 P.3d 884 (2011); *accord State v. Eastmond*, 129 Wn.2d 497, 502, 919 P.2d 577 (1996) (omission of specific intent element of assault was manifest constitutional error under RAP 2.5(a)(3)). But "[a]s long as the instructions properly inform the jury of the elements of the charged crime, any error in further defining terms used in the elements is not of constitutional magnitude." *State v. Stearns*, 119 Wn.2d 247, 250, 830 P.2d 355 (1992) (where drug crime included element of intent to manufacture or deliver, failure to define "manufacture" was not of constitutional magnitude); *accord State v. Scott*, 110 Wn.2d 682, 691-92, 757 P.2d 492 (1988) (conviction for burglary under accomplice theory not constitutionally flawed where instructions failed to define "knowledge" element of accomplice liability). "Even an error in defining technical terms does not rise to the level of constitutional error." *Stearns*, 119 Wn.2d at 250.

The trial court instructed the jury as to the elements constituting the deadly weapon special verdict. This is sufficient so that the alleged error is not of constitutional magnitude. Moreover, the term "accomplice" is a well-understood term. If, as *Stearns*

30

holds, the failure to define even a technical term does not rise to the level of constitutional magnitude, we cannot fathom how the failure to define a well-understood term does. We conclude that the alleged instructional error does not rise to one of constitutional magnitude, and decline to review the claimed error.

D.     CALCULATION OF MAXIMUM TERM/STATUTORY DOUBLING PROVISION

Mr. Haggin argues that the combined terms of confinement and community custody for his possession with intent to deliver convictions exceed the statutory maximum of 10 years. Whether a sentence exceeds the statutory maximum is an issue of statutory interpretation this court reviews de novo. *State v. Bruch*, 182 Wn.2d 854, 859, 346 P.3d 724 (2015). Although Mr. Haggin did not object to these particular sentences at the sentencing hearing, unpreserved sentencing errors may be raised for the first time on appeal. *See State v. Ford*, 137 Wn.2d 472, 477-78, 973 P.2d 452 (1999).

A defendant's sentence cannot exceed the statutory maximum term for the class of crime for which the offender was convicted. RCW 9A.20.021(1). Possession of methamphetamine with intent to deliver is a class B felony with a statutory maximum term of 10 years, or 120 months. RCW 69.50.401(1), (2)(b). Possession of heroin with intent to deliver is also a class B felony with a statutory maximum term of 10 years, or 120 months. *See* RCW 69.50.401(1), (2)(a) (10 year maximum for a "narcotic drug");

31

former RCW 69.50.101(z)(1) (2014) ("narcotic drug" includes opium derivatives);

RCW 69.50.204(b)(11) (heroin is an opium derivative).

When a person is convicted of a felony offense under chapter 69.50 RCW, the trial

court must sentence that person to 12 months' community custody in addition to the other

terms of the sentence. RCW 9.94A.701(3)(c). Terms of confinement and community

custody are both included in the calculation of the statutory maximum term, and the

combination of the two cannot exceed the statutory maximum. RCW 9.94A.505(5); *State

v. Boyd*, 174 Wn.2d 470, 473, 275 P.3d 321 (2012).

RCW 69.50.408 doubles the maximum term for which a defendant may be

confined for drug offenses, thereby defining a new statutory maximum. *See In re Pers.

Restraint of Cruz*, 157 Wn.2d 83, 90, 134 P.3d 1166 (2006) (clarifying that the statutory

maximum is doubled, not the standard range). RCW 69.50.408(1) provides that "[a]ny

person convicted of a second or subsequent offense under [chapter 69.50 RCW] may be

imprisoned for a term up to twice the term otherwise authorized, fined an amount up to

twice that otherwise authorized, or both." An offense is a second or subsequent offense

for purposes of the doubling statute if any of the defendant's prior convictions were

related to "narcotic drugs, marihuana, depressant, stimulant, or hallucinogenic drugs."

*See* RCW 69.50.408(2). This section does not apply to current possession of controlled

32

substance offenses. *See* RCW 69.50.408(3); *State v. McGrew*, 156 Wn. App. 546, 557,

234 P.3d 268 (2010).

Here, the criminal history section in Mr. Haggin's judgment and sentence lists two

prior convictions for violating the Uniform Controlled Substances Act (VUCSA

convictions), chapter 69.50 RCW. If either of these convictions were related to "narcotic

drugs, marihuana, depressant, stimulant, or hallucinogenic drugs," the statutory maximum

sentence for Mr. Haggin's possession with intent to deliver convictions is 20 years. *See*

RCW 69.50.408(2). If the doubling statute applies, Mr. Haggin's combined terms of

confinement and community custody for these convictions may not exceed the 240-month

statutory maximum.

On remand, the trial court must determine whether Mr. Haggin's prior VUCSA

convictions related to "narcotic drugs, marihuana, depressant, stimulant, or

hallucinogenic drugs." If so, the trial court must correct the judgment and sentence to

reflect that the statutory maximum term for Mr. Haggin's possession with intent to deliver

convictions is 20 years, rather than 10 years.

E.    INCONSISTENCY BETWEEN JUDGMENT AND SENTENCE AND LFO APPENDIX

Mr. Haggin argues the judgment and sentence is inconsistent with an attached

appendix. He contends the judgment and sentence states that Mr. Haggin's LFO

33

payments will commence upon his release, but the attached appendix states that Mr. Haggin's first LFO payment is due 30 days from when the judgment and sentence was signed in court.

This inconsistency was likely a scrivener's error, and should be corrected on remand. *See State v. Naillieux*, 158 Wn. App. 630, 646-47, 241 P.3d 1280 (2010) (the remedy for clerical or scrivener's errors in judgment and sentence forms is remand to the trial court for correction).

Affirmed in part and remanded for resentencing.

Lawrence-Berrey, J.

WE CONCUR:

Fearing, C.J.

Pennell, J.

34